# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2992

_____

United States of America,          *
                                   *
        Appellee,          *
                                   *
    v.          *
                                   *
Kenneth Coleman,          *
                                   *
        Appellant.          *


_____

No. 02-2994

_____

Appeals from the United States
District Court for the
Eastern District of Missouri.

United States of America,          *
                                   *
        Appellee,          *
                                   *
    v.          *
                                   *
Andre Worthy,          *
                                   *
        Appellant.          *


_____

No. 02-3147

_____

United States of America,          *
                                   *
        Appellee,          *

|  |  | * |
| v. |  | * |
|  |  | * |
| Orlando Willis, |  | * |
|  |  | * |
| Appellant. |  | * |

_____

Submitted:  June 9, 2003

Filed: November 18, 2003
_____

Before MELLOY, HANSEN, and SMITH, Circuit Judges.
_____

SMITH, Circuit Judge.

Kenneth Coleman, Andre Worthy, and Orlando Willis were charged with a variety of counts arising out of a conspiracy to rob multiple banks. Following a jury trial, appellants were convicted of all counts and sentenced to terms of imprisonment of 709, 444, and 275 months, respectively. Appellants appeal a variety of the district court's[1] rulings–including its refusal to suppress the results of a search warrant and its denial of motions for alleged *Franks* and *Bruton* violations. They also appeal the denial of two motions for mistrial and a sentencing determination. For the reasons stated herein, we affirm.

## I.

Appellants masterminded a series of five bank robberies in the St. Louis area from December 1999 to June 2001. Each robbery followed the same modus operandi. After the bank had closed, appellants would abduct at gunpoint the bank's manager–either in the parking lot of the bank or from her home. Often they would

_____

[1] The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

-2-

restrain and hold hostage the bank manager's family members or roommates. They would then force the manager to open the bank's vaults and automatic teller machines. During each of the robberies, appellants wore ski masks or other disguises and communicated in code with each other through two-way radios. In total, they stole approximately $1.2 million from various banking institutions.

During one bank robbery–a December 8, 2000, robbery of the St. Louis Community Credit Union–a dye pack was accidently taken along with the currency. When the robber left the bank, the dye pack exploded onto some of the currency. Later, some of the dyed currency was used to purchase two money orders at the Grand-U-Buy convenience store and two cans of gun powder and shotgun-shell primers at Graf's Reloading–a gun and ammunition shop.

On both occasions, an employee of the store became suspicious and called the police. At the gun shop, an off-duty police officer became so suspicious that he further monitored the two men who made the purchase. He observed them leave in a dark blue or black customized van with Missouri license plate number 192-BMW or 192-MBW. License number 192-MBW was registered to Sheila Willis, Coleman's aunt, and was listed as a dark blue conversion van. The money orders purchased at the convenience store were later traced to a firearms seller in Ducktown, Tennessee. The money orders were used to purchase two grenade launchers and three reloading kits, deliverable to Kevin Willis (a Coleman alias) at 3116 Hickory Street.

After a failed bank robbery attempt on June 2, 2001, a confidential informant ("CI") came to the St. Louis Police Department ("SLPD") on June 5, 2001, and informed the police that Coleman, Worthy, and possibly Willis were responsible for the string of bank robberies. The CI–who in turn received much of his information from an anonymous source close to the appellants–advised the SLPD and the FBI that the appellants were planning another robbery and that they intended to murder someone while doing it. The CI advised them that Coleman lived at 5034 Bulwer Avenue. The SLPD and the FBI then began independent investigations of Coleman, Worthy, and Willis.

Surveillance of Coleman, Worthy, and Jacqueline Scott–Coleman's girlfriend–confirmed much of the CI's and anonymous source's information. Coleman, Worthy, and Scott were observed coming and going from 5034 Bulwer Avenue and appeared to be preparing for a bank robbery. Further investigations uncovered, among other things: that Worthy's name was on the first floor utilities of the Bulwer Avenue address; that on February 9, 2001, Scott had been arrested during an eviction from her and Coleman's 3116 Hickory Street residence; that during the arrest police seized drugs, drug paraphernalia, and weapons. In addition, records showed that Worthy was on probation for a drug crime and on parole for an armored car robbery, in which Coleman was implicated but not charged.

As a result of the above information, SLPD Detective Wayne Klobe prepared a warrant application and affidavit to search 5034 Bulwer Avenue. After reading the affidavit of Klobe and of the CI, who appeared personally at the hearing, a Missouri state court magistrate issued a warrant to search 5034 Bulwer Avenue. On the morning of June 7, 2001, police executed that warrant. Earlier that night, Coleman and Worthy were also arrested–Coleman in his dark blue conversion van; Worthy in his 1982 Pontiac Firebird. Police then searched Worthy, Coleman, and their cars. During these searches much incriminating information was discovered–including a receipt for a "U-Store It" locker in the name of Orlando Willis. Warrants for the U-Store It locker and for other storage facilities were then obtained and more incriminating evidence was discovered.

Willis was arrested and interviewed. During his interview, he made a number of admissions to FBI Special Agent Eric Simmons regarding the rental of the U-Store It locker. Coleman, Worthy, and Willis were then indicted and charged with a variety of counts, including conspiracy to commit armed bank robberies (violating 18 U.S.C. § 371), attempted armed bank robbery (violating 18 U.S.C. §§ 2, 2113(a) and (d)), and use of a firearm in relation to a crime of violence (violating 18 U.S.C. §§ 2, 924(c)). At trial, the government introduced evidence, which came from a variety of sources–testimony of the managers of the banks, the results of crime scene investigations, information seized after the searches, financial and cell phone records,

other documentary evidence, and results of forensic testing. At one point, a redacted portion of Willis's admission of his rental of the U-Store It locker was permitted–over the objection of Coleman–to come into evidence.

On three relevant occasions through the trial, motions for mistrial were filed. First, Coleman moved for a mistrial after Police Officer Darren Whitehorn, who executed the search on 5034 Bulwer Avenue, testified about narcotics discovered there. (The district court had previously ruled such testimony inadmissible.) Coleman then lodged a second motion after the government's closing rebuttal argument, when the government made a comment regarding a potential witness–Phyllis Paige–and her failure to testify. Finally, Coleman made a motion for mistrial when Willis's counsel directly commented on who had rented the U-Store It locker, why that person had rented it, and who had requested that the person rent it. The district court–after issuing curative instructions–however, denied each of these motions.

The jury returned a verdict of guilty on all counts for each party. The verdict included a special finding that Coleman and Worthy had conspired to rob five banks and that Willis conspired to rob two banks. Based on that special finding, the district court–pursuant to Sentencing Guidelines § 1B1.2(d)–treated each of the five bank robberies as a separate count of conspiracy. Worthy objected, arguing that this amounted to an improper expansion of his indictment. The district court denied that motion and sentenced Coleman to 709 months, Worthy to 444 months, and Willis to 275 months. Coleman, Willis, and Worthy appeal.[2]

## II.

Appellants first challenge the district court's refusal to suppress the results of the searches of Coleman's house and of the U-Store It locker. They initially argue that the searches should have been suppressed because the warrants were not supported

---

[2] In his brief Willis also argues that there was insufficient evidence presented to sustain his conviction. We conclude this argument is without merit and affirm the district court's ruling without further discussion. 8th Cir. R. 47B.

by probable case. They additionally contend that the search of Coleman's house should have been suppressed because the search warrant's supporting affidavit contained deliberate or reckless falsehoods and omissions, which rendered the warrant void under *Franks v. Delaware*, 438 U.S. 154 (1978).

A.

We first address Coleman's, Worthy's,[3] and Willis's[4] claim that the warrants to search Colman's residence at 5034 Bulwer Avenue and the U-Store It locker were not

---

[3] In their pro se briefs, Coleman and Worthy also attack that manner in which the search warrant for Coleman's house was executed, arguing that the police violated the "knock and announce" rule. *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). This argument was not addressed below; thus we review it for plain error. *McKeehan v. Cigna Life Ins. Co.* 344 F.3d 789, 793 (8th Cir. 2003). Having reviewed the record, we find no plain error.

[4] Willis and Worthy, however, lack standing to challenge the search of Coleman's house. *United States v. Padilla*, 508 U.S. 77, 78 (1993). We will not, therefore, address the ancillary arguments they raise. Willis, however, also challenges the search of the U-Store It locker. Because the locker was leased in his name, he has standing to make this challenge. In his brief, however, he makes the same allegations against the search of the locker as Coleman does for the search of his residence. Thus, we will address them concurrently.

supported by probable cause. Specifically, they argue that the warrants were invalid because they relied upon the affidavit of Klobe, who based his affidavit upon double hearsay–information he received from a CI that had been received from an anonymous source. After the district court heard argument on this issue, it denied appellants' motion. We review the denial of a motion to suppress de novo, but review the underlying factual determinations for clear error, giving due weight to the inferences of the district court and law-enforcement officials. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

For a search warrant to be valid, it must be based upon a judicial finding that there is probable cause, that is, a "fair probability" to believe that the listed items may be found at the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 232, 246 (1983). Such a determination is to be based upon the "the totality of the circumstances." *Id.* at 238. In other words, the task of the issuing magistrate is to make "a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

Appellants contend that Klobe's affidavit depends primarily on the information of the CI (and his anonymous source) and that without this information the warrant fails. After reviewing Klobe's affidavit we conclude appellants' argument is without merit. Even without the information from the CI, there existed probable cause for the magistrate to have issued the warrants. The affidavit relies upon information independently derived from at least three different sources–Klobe's own personal investigation of the December 8, 2000, bank robbery; information he received from the FBI; surveillance observations of Coleman, Worthy, and Scott at 5034 Bulwer Avenue residence.

All of these facts–without the information of the CI and his anonymous source–provided the issuing magistrate with sufficient information that evidence of the

bank robberies would have been found at 5034 Bulwer Avenue and at the U-Store It locker. *Gates*, 462 U.S. at 232. As a result, the district court correctly determined that the magistrate had probable cause to issue these search warrants.

B.

Coleman and Willis also contend that the search of Coleman's residence at 5034 Bulwer Avenue should have been suppressed because Klobe's supporting affidavit contained deliberate or reckless falsehoods and omissions in violation of *Franks.* The district court, however, found Klobe's affidavit truthful within the meaning of *Franks* and refused to hold a hearing on this issue. We review the district court's factual determinations on this issue for clear error. *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986).

To prevail on a *Franks* challenge, Coleman and Willis must first establish that Klobe deliberately or recklessly included a false statement in his warrant affidavit. 438 U.S. at 155–56. Alternatively, they may establish a violation if they prove that Klobe deliberately or recklessly omitted a truthful statement from his warrant affidavit. *United States v. Searcy*, 181 F.3d 975, 980 n.9 (8th Cir. 1999). If they demonstrate this and the offensive content is "set to one side," they still must establish, however, that "the affidavit's remaining content" would be insufficient to establish probable cause." *Franks*, 438 U.S. at 156. However, Coleman and Willis cannot establish that Klobe recklessly included false statements or excluded true statements.

Coleman and Willis first raise a long list of statements[5] included in Klobe's affidavit, which they claim violate *Franks*. Initially, they object to many of the statements which were made in regard to the CI and the anonymous source. However, as previously noted, there is sufficient probable cause to support the warrants without these statements.

Coleman and Willis also object to Klobe's inclusion of the following: (1) the use of the term "FBI sources" when Klobe knew that there was only one source; (2) the use of the license plate number "192-BMW" when Coleman's actual plate number was "192-MBW"; identifying that it was the owner of the gun store–not the off-duty police officer–who provided Coleman's license-plate number. Assuming that the appellants' construction of these statements is correct, they–at best–can be characterized as minor discrepancies. A "minor discrepancy" in the wording of an officer's statement is not sufficient under *Franks* to establish that the officer acted deliberately or recklessly in making the statement. *E.g.*, *United States v. Frazier*, 280 F.3d 835, 846 (8th Cir. 2002) (citing *United States v. Searcy*, 181 F.3d 975, 980 (8th Cir. 1999)).

Coleman and Willis also object to numerous *omissions* from Klobe's report, which they claim also violate *Franks*. Two of these omissions merit discussion.[6] First,

---

[5] Coleman and Willis question a number of Klobe's affidavit statements, which they claim are false, including the statements that: (1) "surveillance teams also observed Kenneth Coleman operating [the blue van] on numerous occasions"; (2) "an extensive criminal record including drug violations, stolen property violations, and tampering charges"; (3) that the blue van belonged to Scott. However, other than Coleman's and Willis's allegations, they provide no proof that these statements are inaccurate, that Klobe knew that the statements were inaccurate, or that there is not an alterative truthful explanation. As a result, we will not consider them as potential *Franks* violations.

[6] Coleman and Willis also raise a number of omissions, which we will not consider as *Franks* violations because other than Coleman's and Willis's allegations, there is no proof that Klobe ever knew of the existence of the omission. These alleged omissions include: that Klobe misled the issuing judge by intentionally omitting the facts that Carroll Davis described one of the two men who purchased the gun powder

Coleman and Willis argue that Klobe intentionally omitted the fact that the gun-store owner–where Coleman and Willis allegedly purchased their gun powder and primer–identified another man, Earl Bigelow, as the December 8, 2000, robber. While this is true, Coleman and Willis have made no showing that Klobe omitted the information with an intent to mislead. The most that the record reveals is that Klobe and the FBI agent, who presented the identification photos to the gun-store owner, did not believe that the gun-store owner had made a positive identification of the people who were in his store. *See United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990). At worst, Klobe's conduct was negligent in his disclosure. However, *Franks* does not apply to negligent misrepresentations. *United States v. Schmitz*, 181 F.3d 981, 986 (8th Cir. 1999).

Coleman and Willis additionally complain that another of Klobe's omissions violated *Franks*–the fact that the serial numbers from the recovered dye-stained currency did not match the known serial numbers of the stolen money. However, this omission was not intentionally misleading. Only four serial numbers of the entire $210,590 stolen were even known. Thus, for the reasons stated, Klobe's affidavit was truthful within the meaning of *Franks*, and the district court did not commit error when it refused to hold a hearing on this issue.

---

as "part Hispanic"; that based on Charlotte Peak's description of the December 8, 2000, robbers and the videotape from the bank, Klobe should have known that Coleman could not have been one of the robbers and misled the issuing judge by not disclosing this information; that someone in law enforcement ran Coleman's license plate at 11:48 a.m. on June 6, 2001, and determined that Missouri plate 192-MBW was registered to someone other than Coleman.

Moreover, two additional alleged omissions–that Coleman was not under the influence of drugs when he was arrested during the late evening hours of June 6, 2001, and that a female, not otherwise linked to Coleman, had passed dye-stained currency at a Lowe's hardware store–are simply not relevant to the determination of whether there was probable cause to search the 5034 Bulwer Avenue residence or to search the locker. As a result, we will not consider them.

## III.

Next, Coleman argues that the government and Willis violated his Sixth Amendment Confrontation Clause rights as construed by *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the Supreme Court held that the admission of a non-testifying defendant's statement that inculpated a codefendant, violated the latter's Confrontation Clause rights, despite a curative instruction otherwise. *Id.* at 135–36. Subsequent Supreme Court cases have held that *Bruton* is not violated if the non-testifying defendant's statement only inculpates a codefendant inferentially–through linkage to other evidence. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987). As a result, *Bruton* violations may be avoided through redaction if a cautionary jury instruction is given, if the redactions are neutral, and if they do not obviously directly refer to the defendant. *Gray v. Maryland*, 523 U.S. 185, 196 (1998).

The district court denied Coleman's motion. We review under the harmless error standard. *United States v. Garcia*, 836 F.2d 385, 391 (8th Cir. 1987). On appeal, Coleman argues that (1) the government's direct and Willis's cross-examination of Simmons and (2) Willis's comments during his closing argument violated *Bruton.*

## A.

Coleman first contests Simmons's testimony. Simmons testified to Willis's post-arrest interview and to his rental of a U-Store It locker. During his interview, Willis told Simmons that he rented the locker for Coleman. Willis also admitted that he filled out and signed the lease form. Willis stated that Coleman, Scott, and he were in Coleman's blue van when they rented the locker. After he returned to the van, he gave the gate code to Coleman. In an attempt to avoid a *Bruton* problem, the government orally led Simmons in the questions concerning Willis's post-arrest interview, substituting the phrase "someone" for Coleman:

> Q:     Agent Simmons, I'm going to ask you a few questions about the statements made by Mr. Willis, and in response to my questions I'm only looking for a yes or no answer, okay?

A:    Okay.

Q:    With respect to renting the locker, did Mr. Willis indicate that he had rented it for someone else who drove a blue van?

A:    Yes.

Q:    Did he indicate that someone else and Jackie Scott were with him when it was rented?

A:    Yes.

Q:    Did Mr. Willis indicate that he, meaning Mr. Willis, was the one who filled out the lease on the rental of the locker?

A.    Yes.

Q:    And did Mr. Willis indicate that he chose the code to get into the lot and gave that code to another person?

A:    Yes.

This redaction is permissible under *Bruton* and its progeny. *Richardson*, 481 U.S. at 208; *Gray*, 523 U.S. at 196. We see no difference in the facts of this case and our decision in *United States v. Logan*, 210 F.3d 820 (8th Cir. 2000) (en banc). In *Logan*, we found no *Bruton* violation when the government substituted the phrase "another individual" for specific references to the non-declarant codefendant in connection with an officer's oral testimony about the declarant's oral confession. *Id.* at 822. Moreover, the district court issued a curative instruction. *United States v. Edwards*, 159 F.3d 1117, 1125–26 (8th Cir. 1998). Therefore, the government's questioning of Simmons did not violate *Bruton*.

Coleman also argues that upon cross-examination of Simmons, Willis's counsel violated *Bruton*. However, like the government, Willis's counsel substituted a neutral

phrase ("person") for Coleman. Thus, for the same reason stated above, Willis's counsel did not violate *Bruton*.

B.

We do, however, find a more serious problem with Willis's closing argument. During that argument, Willis's counsel addressed the jury and stated:

> Mr. Willis told the FBI, Special Agent Simmons, the same information and, according to the phone records, apparently Mr. Coleman called Mr. Willis the day before, October 25, to ask him to rent a storage locker for him. He said he would pick him up, he would take him to the facility and gave him the money. [Willis then] went into [the locker office], filled out the contract, signed the contract, and left.

Willis also argued that the evidence suggested that it was Coleman who requested Willis to list Coleman's alias on the lease agreement's permission-to-enter list. Coleman objected to this comment and moved for a mistrial. The district court denied the mistrial, but gave a curative instruction. The government argues that the instruction was sufficient to cure Willis's closing statement. However such a limiting instruction is not constitutionally sufficient when "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, [was] deliberately spread before the jury in a joint trial." *Bruton*, 391 U.S. 135– 36. Whether Willis's statement in closing argument was this type of "powerfully incriminating statement" presents a difficult question.

We need not answer it, however, because even assuming that this statement violated *Bruton*, it was harmless beyond a reasonable doubt. It is well-established that a *Bruton* error is subject to harmless-error analysis. *Edwards*, 159 F.3d at 1128. Thus, we must consider "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Thus, there is no *Bruton* error when the erroneously admitted evidence is "merely cumulative of other

overwhelming and largely uncontroverted evidence properly before the jury." *Brown v. United States*, 411 U.S. 223, 231 (1973). In this case, the government presented overwhelming testimony to prove Coleman's guilt–the testimony of five bank managers, evidence seized from various cars, Coleman's house, and from lockers, as well as substantial forensic and documentary evidence. Thus, because Willis's statement is cumulative of the other overwhelming testimony against him, Coleman's argument fails.

## IV.

Coleman next contends that the district court erred when it twice failed to declare a mistrial. We review denials of a mistrial for an abuse of discretion. *United States v. O'Dell*, 204 F.3d 829, 834 (8th Cir. 2000). Coleman argues that the district court should have declared a mistrial when Whitehorn testified about Coleman's involvement with narcotics and when the government made a statement during its closing rebuttal argument.

## A.

Coleman first contends that the district court erred in denying his motion for a mistrial after Whitehorn referenced narcotics during his testimony. Prior to trial, Coleman and the government formally agreed that they would not introduce drug evidence. At trial, however, while discussing the capture of several silencer books, Whitehorn testified that police seized a "large quantity of narcotics." Coleman objected.

When such a statement is introduced, the "prejudicial statement is ordinarily cured by striking the testimony and instructing the jury to disregard the remark." *United States v. Muza*, 788 F.2d 1309, 1312 (8th Cir. 1986) (citation omitted). In this case, after Coleman objected, the district court issued a curative instruction to the jury and directed them that Coleman had nothing "to do with drugs." As a result, we "must determine with fair assurance whether, in spite of the instruction, the verdict was substantially swayed by the error." *Id.* (citations omitted).

In making this determination, we apply a two-step analysis. First, we "examine the trial context of the error, and the prejudice created thereby . . . ." *Id.* (citation omitted). We then juxtapose the prejudice "against the strength of the evidence of appellant's guilt." *Id.* (citation omitted). If "there was substantial evidence of appellant's guilt, any error in the admission of the statements [would be] harmless." *Id.* at 1313 (citation omitted).

In this case, the prejudicial impact to Coleman from an improper reference to narcotics was minimal. Whitehorn only mentioned drugs once. The district court immediately issued a curative instruction and minimized the importance of the drug reference to the jury. Furthermore, there was substantial, non-prejudicial evidence of Coleman's guilt, which was introduced at trial. As noted previously, the government proved its case with eye-witness testimony, documentary evidence, and circumstantial evidence. This evidence–when compared with the single reference to drugs–leads us to conclude that the district court did not err when it denied Coleman's first mistrial motion.

B.

Coleman also argues that the district court erred when it denied his motion for mistrial after the government presented its rebuttal closing argument. During his closing argument, Coleman questioned why Phyllis Paige, a person about whom many of the witnesses had testified, was never called to testify. In its rebuttal argument, the government responded to that comment, noting that "Phyllis Paige wasn't called by anyone in this case. And the last time I checked, people in this country have a right to refuse to answer questions and refuse from incriminating themselves." Coleman objected and argued that it was an improper indirect comment against Coleman's Fifth Amendment right not to incriminate himself.

Prosecutorial misconduct in closing argument is grounds for a mistrial when "(1) the prosecutor's remarks are in fact improper, and (2) the remarks prejudicially affect the defendant's substantial rights so as to deprive the defendant of a fair trial." *O'Dell*,

204 F.3d at 834 (citation omitted). In this case, Coleman's argument fails because the prosecutor's remarks were not improper. It is a general rule that the prosecution shall not directly comment on a defendant's Fifth Amendment right not to testify. *Griffin v. California*, 380 U.S. 609, 612 (1965); *Hoffman v. United States*, 341 U.S. 479, 486–87 (1951). The rule was not violated here because the rebuttal remark was a fair response to Coleman's suggestion that the government should have called Paige as a witness and because the remark did not comment on Coleman's right to remain silent. The remarks here referred to Paige's right to invoke the Fifth Amendment, not Coleman's.

Coleman thus argues that the comment amounted to an indirect comment on Coleman's right not to testify. This argument is without merit. "The test to be applied is whether the comment must have been clearly intended or be of such a nature that the jury would naturally and necessarily view the comment as a reference to defendant's failure to testify." *United States v. Singer*, 732 F.2d 631, 637 (8th Cir. 1984) (citation omitted). Because Coleman cannot meet such a stringent test, we conclude that the district court did not commit error when it refused to declare a mistrial based upon the comment.

V.

Finally, Worthy contends that the district court committed a sentencing error that requires our reversal. Among other counts, Worthy was charged with one count of conspiracy to commit bank robberies. However, this count only listed the overt acts of two bank robberies. Nevertheless, when Worthy was found guilty, the jury specifically found that he had participated in the conspiracy of five bank robberies. Thus, three of the bank robberies were not listed within overt acts of his indictment. Based upon Sentencing Guidelines § 1B1.2(d), the district court then treated each of the five bank robberies as separate counts of conspiracy.[7]

---

[7] Guidelines § 1B1.2(d) provides that a "conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant

-16-

Worthy argues that he was improperly sentenced based upon five bank robberies because the overt acts of the indictment only alleged his participation in two bank robberies. It is true that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215–16 (1960). However, Worthy was charged with conspiracy to commit multiple bank robberies. In a charge of conspiracy, the government is not limited to proof of the overt acts charged in the indictment, *see United States v. Dolan*, 120 F.3d 856, 866 (8th Cir. 1997); *United States v. Lewis*, 759 F.2d 1316, 1344 (8th Cir. 1985), and a defendant may be held responsible for any of the acts of the conspiracy. *United States v. Cordova*, 157 F.3d 587, 597 (8th Cir. 1998). In this case, the five robberies fell within the temporal and substantive scope of the conspiracy. As a result, Worthy's argument fails.

## VI.

Thus, for the reasons stated herein, we affirm the judgment of the district court.

_____

conspired to commit."